982 So.2d 494 (2007)
BILLY BARNES ENTERPRISES, INC.
v.
Herman Gerald WILLIAMS.
1050183.
Supreme Court of Alabama.
September 28, 2007.
*495 David M. Wilson and Irene E. Blomenkamp of Wilson & Berryhill, P.C., Birmingham, for appellant.
Taylor T. Perry, Jr., of Manley, Traeger, Perry & Stapp, Demopolis, for appellee.
SMITH, Justice.
Billy Barnes Enterprises, Inc. ("Billy Barnes"), the defendant below, appeals from the judgment of the trial court enforcing a settlement agreement between Billy Barnes and the plaintiff, Herman Gerald Williams, in this personal-injury action stemming from a railroad accident. We reverse and remand.

Facts and Procedural History
Williams worked as a "switchman" for Railserve, Inc. ("Railserve"), a company that provides railroad switching services. On April 12, 2001, Williams was riding on the rear railcar of a train operating on the grounds of a lumber mill owned by Weyerhaeuser Company ("Weyerhaeuser") and located in Pine Hill. The train was moving in reverse, and Williams was providing directions over a radio to the engineer operating the train's engine, Alex D. Young, who could not see the rear of the train.
As the train neared a road crossing, a truck approached the crossing at a high rate of speed and failed to yield to the train. Williams activated an emergency brake in an attempt to stop the train and avoid a collision with the truck. The emergency brake caused the train to jerk, and Williams was thrown off the train and onto the tracks, where the train rolled over one of his legs, causing significant injury. Williams radioed Young for help, and Young contacted the guard shack at the lumber mill to send medical assistance. Gladys Dobbs, a nurse employed by Weyerhaeuser, responded with an ambulance. Dobbs later completed an occupational-injury report and recorded that the accident was reported at 8:05 p.m.
On February 13, 2003, Williams sued Billy Barnes. In his complaint, Williams alleged that the truck that failed to yield and thereby contributed to the accident was owned and operated by Billy Barnes. Thus, Williams alleged, Billy Barnes was liable for his injuries.
In February 2004, Billy Barnes filed a motion for a summary judgment. With its motion, Billy Barnes submitted evidence from the computerized gate log at the lumber mill and the scale receipts that demonstrated that three Billy Barnes trucks had been at the lumber mill at various times on the day of the accident, but that the last truck had left the facility at 6:37 p.m., well before the accident was reported to Dobbs at 8:05 p.m. Thus, Billy Barnes argued that it was entitled to a summary judgment because, it said, none of its trucks were involved in the accident.
*496 In response to the summary-judgment motion, Williams filed an affidavit in which he stated that the accident occurred shortly after 6:00 p.m. and that he could clearly see the words "Billy Barnes" written on the side of the truck. Williams further stated that it took a substantial amount of time for help to arrive after the accident occurred. The trial court subsequently denied the motion for a summary judgment.[1]
In April 2004, counsel for Billy Barnes sent a proposed nonparty subpoena to counsel for Railserve, requesting worker's compensation documents relating to Williams's accident including, among other things, any statement obtained from Williams. Railserve answered with an objection but also produced numerous medical and worker's compensation documents. The materials do not mention whether a statement was taken from Williams. In August 2004, counsel for Billy Barnes requested additional information not found in the worker's compensation documents, including whether anyone had obtained a statement from Williams. Billy Barnes asserts that in response to this letter, Railserve's counsel indicated that no statements from Williams were provided by the workers' compensation carrier.
Williams was deposed in December 2004, and he testified that he had given no statement regarding the accident. Williams gave a detailed description of the truck that failed to yield at the crossing, stating that he was able to read the words "Billy Barnes Trucking," which were written in white and red letters. Williams further testified that the accident occurred sometime between 6:15 p.m. and 7:00 p.m. Williams stated that he could not immediately contact anyone on the radio for help, and that a period of time passed before he received any aid. Williams further stated that he first told someone that a Billy Barnes truck was involved when Rick Delloma  a Railserve employee  and an "insurance person" visited him at the hospital after the accident.[2] Williams was then asked: "Q: . . . Have you given any kind of verbal statement to anybody, that was recorded to your knowledge, about what happened?" Williams answered: "No."
In May 2005, The Marmon Group, LLC ("Marmon"), the parent corporation of Williams's employer, Railserve, filed a complaint seeking to intervene in the case as a plaintiff. Specifically, Marmon alleged that it had paid over $140,000 in worker's compensation benefits in connection with Williams's injury and that it was therefore entitled to certain subrogation rights to any award Williams would receive in his action against Billy Barnes.
In June 2005, Railserve was served with subpoenas by Billy Barnes to disclose any statements or reports concerning the accident. In a letter dated July 20, 2005, counsel for Railserve responded to the subpoenas and indicated that he was "not aware of any non-privileged documents" that had not already been produced. Billy Barnes's counsel responded with a letter indicating that, because he did not know what materials counsel was claiming were privileged or nondiscoverable, he requested a "privilege log" supporting any claim of privilege and to clarify whether any statements existed and, if so, whether the statements could be voluntarily produced. Billy Barnes asserts that Railserve refused to voluntarily provide a privilege log. Billy Barnes thus filed a motion to compel, seeking production of the privilege log.
*497 The trial court held a hearing on the motion on August 8, 2005. At the hearing, Billy Barnes's counsel expressed the opinion that it was unusual that neither Marmon nor its subsidiary Railserve took recorded statements from any witnesses in anticipation of a future worker's compensation action by Williams. Furthermore, Alex Young had stated in his deposition that Rick Delloma had taken a statement from him, but neither Railserve nor Marmon had produced such a statement in response to the subpoenas.
Counsel representing both Marmon and Railserve stated in open court that they were not aware of any such statements and that they had been told that none existed. Nevertheless, the trial court explicitly ordered Marmon and Railserve's counsel to turn over a privilege log and any recorded statements:
"If there are any recorded statements . . . if there are statements taken, if there is anything done . . . in the way of an investigation of this accident, then I would require that those things be produced. . . . If somebody has been tape-recording conversations, and I require that the tape-recorded conversation be produced. . . . "
Billy Barnes received a privilege log from counsel for Marmon and Railserve on August 9, 2005. On August 11, Billy Barnes filed two motions asking the trial court to compel production of certain materials listed on the privilege log, including a "Memo to the File" authored by Delloma regarding his investigation of the accident. Billy Barnes also filed a general request to compel Marmon to produce any statements relating to Williams's accident.
Trial was scheduled to start on August 29, 2005. On August 19, 2005, the parties held a mediation conference. On August 22, a conference call was held with the parties and the trial court, during which Billy Barnes again argued its motions to compel. Regarding the August 22 conference call, Billy Barnes's counsel stated in an affidavit:[3]
"[The trial court] verbally ordered [Marmon and Railserve's counsel] to produce the `Memo to the File' authored by Mr. Rick [Delloma], and further to determine whether any worker's compensation carrier or third party administrator was in possession of any recorded statements. If so, [counsel] was to produce the statements."
Billy Barnes's counsel "received the Memo to the File via facsimile at approximately 3:00 p.m. on August 22. There was no mention of any recorded statement having been taken from Mr. Williams. . . ." Later that day, Billy Barnes and Williams agreed to a settlement in the amount of $500,000.
On August 23, 2005  the next day  counsel for Marmon and Railserve contacted Billy Barnes and indicated that two audiotapes of recorded statements had been located and were being transcribed, but that the identities of the persons giving and taking the statements were unknown. On August 25, 2005, Billy Barnes received transcripts of recorded statements by Young and by Williams. In Williams's statement, which was apparently taken on April 18, 2001, several days after the accident, Williams stated: (1) that he was aware that his statement was being recorded and that it was being recorded with his permission; (2) that the accident occurred "close to 8:30"; and (3) that when he looked at the truck that *498 caused the accident he "couldn't see a name" written on it.
On September 7, 2005, Billy Barnes filed a motion to set aside the settlement agreement and to restore the case to the trial docket. In the motion, Billy Barnes argued that it had "steadfastly maintained" that it did not have a truck present at the lumber mill at the time of the accident and that the only person who purportedly saw a Billy Barnes truck in the lumber mill at the time of the accident was Williams. Williams, however, had testified that a Billy Barnes truck caused the accident. Additionally, Billy Barnes noted in the motion that Williams's sworn testimony, procured after Billy Barnes had produced evidence indicating that its last truck had left the lumber mill at 6:37 p.m., specifically asserted that the accident occurred between 6:15 p.m. and 7:00 p.m., despite Dobbs's record indicating that the accident was reported at 8:05 p.m. Billy Barnes noted that Williams's recorded statement directly contradicted his later sworn testimony inculpating Billy Barnes. Billy Barnes then argued that it had agreed to settle the case based on Williams's testimony that he had given no recorded statement. Finally, Billy Barnes argued in the motion that generally settlement agreements may be set aside because of fraud, collusion, accident, surprise, and similar grounds; that parties are entitled to the rescission of a settlement agreement that was entered into in reliance upon a misrepresentation made willfully, recklessly, negligently, or even innocently; that the settlement agreement should be set aside based on evidence of "intrinsic" fraud by the plaintiff; and that Williams had obstructed discovery by falsely stating that he had not given a recorded statement regarding the accident. Billy Barnes's motion was supported by the affidavit of its counsel, David Wilson, and other documentary evidence.
Williams filed an opposition to the motion to set aside, which moved the trial court both to enforce the settlement agreement and to order sanctions against Billy Barnes and its counsel.
The trial court held a hearing and on September 30, 2005, denied the motion to set aside the settlement agreement. On October 7, 2005, the trial court granted Williams's motion to enforce the settlement agreement, holding that Williams did not commit fraud and that the settlement agreement was binding and enforceable. The trial court then entered a judgment in favor of Williams in the amount of $500,000, the amount of the settlement. Billy Barnes appeals.

Standard of Review
No witnesses testified at the hearing on the motions to set aside or to enforce the settlement agreement. Because the trial court did not receive ore tenus evidence and instead considered only the documentary evidence, depositions, and affidavits submitted by the parties, our review is de novo. See Phillips v. Knight, 559 So.2d 564, 567 (Ala.1990); see also McIver v. Bondy's Ford, Inc., 916 So.2d 616, 619 (Ala.Civ.App.2005) ("Because the trial court did not receive ore tenus evidence as to the alleged settlement agreement, we review the judgment without a presumption of correctness.").

Discussion
On appeal, Billy Barnes argues that the trial court erred in refusing to rescind the settlement agreement. We agree.
"A validly executed settlement agreement is as binding on the parties as any other contract." Grayson v. Hanson, 843 So.2d 146, 150 (Ala.2002). However, settlement agreements may be reopened for reasons of fraud, accident, or mistake. Nero v. Chastang, 358 So.2d 740 (Ala.Civ. *499 App.1978); see also Taylor v. Dorough, 547 So.2d 536, 540 (Ala.1989) ("A release obtained by fraud is void."); Lowery v. Mutual Loan Soc'y Inc., 202 Ala. 51, 53, 79 So. 389, 391 (1918) ("It is elementary law that one who has been induced to enter into a contract by the material misrepresentations of the other party may, if he acts with reasonable promptness upon the discovery of the fraud, rescind the contract in toto. . . ."); Burks v. Parker, 192 Ala. 250, 68 So. 271 (1915) (noting that when a settlement is obtained by fraud, the agreement may be set aside in its entirety); and Business Credit Leasing, Inc. v. Money's Ford, Inc., 582 So.2d 555, 557 (Ala.Civ. App.1991) ("Moreover, a person induced to enter into a contract by reason of false representations has a right to rescind the contract because of fraud.").
In determining whether a settlement agreement should be rescinded or set aside because of fraud, the courts of this state have applied the definition of legal fraud in Ala.Code 1975, § 6-5-101. See, e.g., Burlington Northern R.R. v. Warren, 574 So.2d 758, 766-67 (Ala.1990) (plurality opinion), and Coaker v. Washington County Bd. of Educ., 646 So.2d 38, 42 (Ala.Civ.App.1993). That Code section provides: "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud." We have described these elements as follows:
"Regardless of whether the representation is made willfully, recklessly, or mistakenly, a plaintiff alleging fraud must prove four elements: (1) a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance."
George v. Associated Doctors Health & Life Ins. Co., 675 So.2d 860, 862 (Ala.1996). Additionally, "`[a]n innocent misrepresentation is as much a legal fraud as an intended misrepresentation and the good faith of a party in making what proves to be a material misrepresentation is immaterial as to the question whether there was an actionable fraud if the other party acted on the misrepresentation to his detriment.'" Davis v. Sterne, Agee & Leach, Inc., 965 So.2d 1076, 1091 (Ala.2007) (quoting Smith v. Reynolds Metals Co., 497 So.2d 93, 95 (Ala.1986)).
Billy Barnes's motion to set aside the settlement agreement sought a rescission of the contract on the ground of fraud. Specifically, Williams's representation that he had given no recorded statement regarding the accident, Billy Barnes alleged, induced it to enter into the settlement agreement with Williams because Billy Barnes's counsel believed that, without the existence of a statement by Williams to the contrary, the jury would believe testimony by Williams that a Billy Barnes truck had caused the accident at the time the truck was at the lumber mill.[4] On appeal, Billy Barnes contends that it demonstrated the elements of fraud and that, therefore, the trial court erred in not setting aside the settlement agreement.
First, it is undisputed that Williams testified in his deposition in response to a question that he had given no "verbal statement" that had been recorded. This representation was not accurate. Williams argues on appeal that there is "no evidence" indicating that he understood what was meant by the phrase "verbal statement," and thus that his negative answer should be considered only "facially imprecise" *500 and not "demonstrably false." However, Williams's subjective state of mind when he answered the question  i.e., whether he believed he was answering the question correctly  does not affect the accuracy of the answer. At best, it would indicate only whether his answer was made in good faith. However, as noted above, an innocent misrepresentation will nonetheless support an allegation of legal fraud under Ala.Code 1975, § 6-5-101. Davis, supra.
Second, Billy Barnes argues that Williams's representation that he had not given a recorded statement following the accident concerned a material existing fact and that Billy Barnes relied on the representation. Specifically, an affidavit by Billy Barnes's counsel, Wilson, presented in support of the motion to set aside detailed how Williams's representation affected Billy Barnes's decision to enter into the settlement agreement:
"In evaluating this matter for the purposes of settlement, and in order to properly advise my client of the benefits versus risk of settling, or not settling, I relied on Herman Williams'[s] sworn testimony that he had not given a recorded statement, and that he had told Mr. [Delloma], Mr. [Pulian] and the `insurance person' that a Billy Barnes truck was involved in this accident. . . .
". . . .
". . . The said offer of settlement had been made on my assumption that there were no prior inconsistent statements made by Mr. Williams to refute his testimony that he did not give a recorded statement, that a Billy Barnes truck was involved, and further that there was no inconsistent prior statements concerning the time of the accident. I had considerable concern that despite the strong evidence I had developed on the issues of at what hour the accident occurred and that no Billy Barnes truck was present at Weyerhaeuser's property at the time of the accident, a jury could simply accept Mr. Williams'[s] testimony and award substantial damages. In other words, while I felt we could prove our case, I could not disprove what Mr. Williams contended, relying on his sworn testimony that he did not give a recorded statement, etc.
". . . .
"Had I known of the existence of, or been in possession of this statement, prior to the mediation and/or any offers of settlement being made, my evaluation of the case and my advice to my client concerning settlement issues, would have been entirely different."
The trial court held that Billy Barnes had not reasonably relied on Williams's deposition testimony. Specifically, the trial court stated that the evidence "clearly" proved that Billy Barnes "doubted or rejected and indeed challenged the veracity of Herman Williams's statement, that Herman had not given a tape-recorded statement," and that Billy Barnes's counsel "was actively seeking the alleged tape-recorded statements of Herman Williams at the time of this settlement. . . ."
"An essential element of any fraud claim is that the plaintiff must have reasonably relied on the alleged misrepresentation." Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1160 (Ala.2003). "[F]or a plaintiff to state a fraud claim, he must show that a misrepresentation induced him to act in a way that he would not otherwise have acted, that is, that he took a different course of action because of the misrepresentation." Hunt Petroleum Corp. v. State, 901 So.2d 1, 5 (Ala.2004). However, "[w]here a party has reason to doubt the truth of the representations or is informed of the truth before he acts, he has no right to act thereon." *501 MJM, Inc. v. Casualty Indem. Exch., 481 So.2d 1136, 1141 (Ala.1985).
It is true that, before the settlement agreement was entered into, Billy Barnes's counsel expressed concerns that it was unusual that neither Marmon nor Railserve had taken any recorded statements from Williams following the accident. However, in light of the sequence of events in this case and the evidence produced by Billy Barnes, we hold that Billy Barnes demonstrated that at the time it ultimately entered into the settlement agreement, it relied on Williams's representation that he had given no recorded statement.
Williams testified under oath that he had given no statement. Marmon and Railserve's counsel stated in open court that they had no statements from Williams. At the August 8 hearing on Billy Barnes's motion to compel, the trial court ordered counsel for Marmon and Railserve to turn over any statements Williams had given. During the August 22 conference call, Marmon and Railserve's counsel was again ordered to turn over any recorded statements, if they existed, along with Delloma's memorandum. Marmon responded to the trial court's order and produced Delloma's memorandum, but did not mention any statements by Williams.
The affidavit of Billy Barnes's counsel, the only direct evidence found in the record before us on this issue, states that when Billy Barnes finally entered into the settlement agreement, it relied on Williams's representation that there was no recorded statement. The following requests in the record indicate that Billy Barnes had been seeking any possible recorded statements from Marmon and/or Railserve for over 16 months:
1. A proposed nonparty subpoena to Railserve in April 2004: Railserve responded but included no statements.
2. A request in August 2004: Railserve's counsel indicated that no statements from Williams had been provided by the workers' compensation carrier.
3. Williams's deposition in December 2004: Williams stated that he had given no statement.
4. Subpoenas in June 2005: In a letter dated July 20, 2005, counsel for Railserve indicated that he was "not aware of any non-privileged documents."
5. A request sent on July 20, 2005, seeking a privilege log and an indication whether such a statement could be voluntarily produced: Railserve refused to produce a log.
6. A motion to compel: Counsel for Marmon and Railserve stated in open court that they were not aware of any statements and that they had been told that there were none.
7. The trial court's order to produce a privilege log and any statements taken regarding the accident: A privilege log was produced but did not indicate whether there were any statements by Williams.
8. An August 11 motion to compel production of Delloma's memorandum and any statements.
9. An August 22 order by the trial court to turn over Delloma's memorandum and any statement in the possession of Marmon, Railserve, or a "worker's compensation carrier or third party administrator": Delloma's memorandum was delivered, but no statement.
It is true that throughout the discovery process Billy Barnes continued to seek from Marmon and/or Railserve the production of any statement made by Williams. However, at the point in time at which the settlement agreement was ultimately executed  in mediation on the eve of trial  Billy Barnes had taken every measure to *502 ensure that Marmon or Railserve would produce any statement that either possessed. Indeed, it appears that no further legal process was available to Billy Barnes to require Marmon or Railserve to comply with the trial court's direct and explicit orders to produce such a statement. Billy Barnes had no cause to believe that Marmon or Railserve failed to comply with the trial court's discovery orders, and Billy Barnes possessed no other source of information that could demonstrate that Williams had given a statement. The fact that no statement was produced, coupled with Williams's testimony that he had given no statement, supports Billy Barnes's argument that, at the time it entered into the settlement agreement, it reasonably believed Williams's representation that no statement existed.
Given the evidence presented by Billy Barnes, we hold that in light of the circumstances of this case dealing with Billy Barnes's exhaustion of all reasonable steps calculated to lead to discovery of Williams's prior statement, if it did exist, Billy Barnes, at the time it entered into the settlement agreement, reasonably relied on Williams's representation  whether innocently, mistakenly, or intentionally made  that he had given no prior statement regarding the accident.
Finally, we hold Billy Barnes was damaged by its reliance on Williams's representation, which is demonstrated by the affidavit of Billy Barnes's counsel stating that Billy Barnes would not have agreed to the $500,000 settlement if it had known of the recorded statement. Therefore, Billy Barnes has demonstrated the necessary elements establishing that the settlement agreement was procured by fraud.

Conclusion
We conclude that the trial court erred in refusing to set aside the settlement agreement. The settlement agreement is due to be set aside. We reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
SEE, LYONS, STUART, BOLIN, and PARKER, JJ., concur.
WOODALL and MURDOCK, JJ., concur in the result.
COBB, C.J., dissents.
MURDOCK, Justice (concurring in the result).
(1) Whether Billy Barnes actually believed William's misrepresentations and whether Billy Barnes reasonably relied on those misrepresentations.
Given the evidence presented, I conclude that Billy Barnes did not subjectively believe either (a) Williams's affidavit and deposition testimony as to the time of the accident and indicating that he saw the name "Billy Barnes" on the side of the truck that failed to yield at the crossing and (b) Williams's representation that he had not previously given a verbal or recorded statement about the accident. I agree with the result reached by the main opinion because, in my view, the "reliance" that took place in this case was not reliance in a volitional sense. Given (i) the rules of discovery that govern our civil justice system and by which Billy Barnes was bound, (ii) the thoroughness of Billy Barnes's attempts for approximately one and one-half years to obtain truthful discovery responses and the fact that the trial was set to begin in one week at the time Billy Barnes agreed to settle the case, and (iii) the nature of the formal and informal answers to discovery repeatedly given by or on behalf of Railserve, Marmon, and Williams, Billy Barnes had no alternative but to "rely" upon the discovery responses *503 received by it as to the matters described in both clauses (a) and (b) of the first sentence of this paragraph. In essence, Billy Barnes was forced to act upon the only information it could obtain prior to trial as to these matters  the only information as to these matters that would be provided to a fact-finder in the event of a trial. Cf. Quinn v. City of Kansas City, 64 F.Supp.2d 1084, 1092 (D.Kan.1999) ("Regardless whether defendants believed plaintiff's testimony, the possibility that a jury would believe plaintiff forced defendants to attach reasonable importance to his false testimony in deciding whether to settle the case. Plaintiff's misrepresentations were therefore material.").[5]
(2) Whether Williams engaged in intentional or innocent fraud.
I see no need to reach the question whether the judgment of the trial court should be reversed if Williams's misrepresentations were "innocent." In my view, this is a case of intentional fraud.
Williams argues to this Court that there is no evidence indicating that he understood the meaning of the term "verbal statement." This argument is ill founded. The term "verbal statement" has a plain meaning; it is not ambiguous. If Williams seeks to argue that he did not understand it, the burden was upon Williams to produce evidence that he did not, not upon Billy Barnes to prove that he did. There is no evidence that Williams did not understand the meaning of the term "verbal statement."
Moreover, there is ample evidence affirmatively indicating that Williams intended to deceive Billy Barnes not only as to the existence of a prior recorded statement, but also as to the circumstances surrounding the accident. In the recorded statement that ultimately was produced, Williams stated (1) that the accident occurred close to 8:30 p.m. and that it was dark at the time and (2) that he could not see a name on the truck that caused the accident. Before this recorded statement came to light, Williams told a much different "story" in his deposition and affidavit testimony, namely (1) that the accident occurred between 6:15 p.m. and 7:00 p.m. (after Billy Barnes produced evidence indicating that its last truck left Weyerhaeuser's facility at 6:37 p.m.) and while it was still light outside and (2) that he clearly saw the words "Billy Barnes" in red and white letters on the truck that caused the accident. This is the same deposition in which Williams denied the existence of the prior recorded statement that, as we now know, described a very different version of events.[6]
I can draw no conclusion other than that Williams committed intentional fraud.
COBB, Chief Justice (dissenting).
I respectfully dissent. In order to establish a fraud claim, Billy Barnes was required to prove each of four elements: (1) a false representation (2) of a material existing fact, (3) reasonably relied on by the claimant, (4) who suffered damage as a *504 proximate consequence of the misrepresentation. United Land Co. v. Drummond Co., 962 So.2d 753 (Ala.2006); Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143 (Ala.2003). In this case, the trial court, sitting as the trier of fact in the hearing on the motion to set aside the settlement agreement, determined that Billy Barnes did not reasonably rely on the deposition testimony given by Williams. Specifically, Billy Barnes's lawyer stated before the trial court that he was sure that Williams had given a recorded statement or statements and that he was actively attempting to obtain discovery of the statement in spite of Williams's testimony that he did not recall giving any such statement. Here the evidence as to whether Billy Barnes reasonably relied on Williams's representations was in conflict, and the weight of the evidence favored the trial court's determination that Billy Barnes had not relied on Williams's representations. See, e.g., Harold Allen's Mobile Home Factory Outlet, Inc. v. Early, 776 So.2d 777 (Ala.2000); cf. Foremost Ins. Co. v. Parham, 693 So.2d 409 (Ala.1997); and McIver v. Bondy's Ford, Inc., 963 So.2d 136 (Ala.Civ.App.2007). Appellate review in such a situation is limited:
"`[W]hen the evidence in a case is in conflict, the trier of fact has to resolve the conflicts in the testimony, and it is not within the province of the appellate court to reweigh the testimony and substitute its own judgment for that of the trier of fact.' Delbridge v. Civil Serv. Bd. of Tuscaloosa, 481 So.2d 911, 913 (Ala.Civ.App.1985). `[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow.' Ex parte Foley, 864 So.2d 1094, 1099 (Ala.2003) (citations omitted)."
Ex parte R.E.C., 899 So.2d 272, 279 (Ala. 2004).
NOTES
[1] Billy Barnes later filed another summary-judgment motion, which was also denied.
[2] It appears from the record that another Railserve employee, Tim Pulian, was also present during the hospital visit.
[3] Counsel's affidavit was submitted in support of Billy Barnes's motion to set aside the settlement agreement.
[4] Billy Barnes also argued that Williams suppressed the existence of the statement.
[5] We are not presented in this case with an argument by Billy Barnes that this fraud constituted a "fraud upon the court."
[6] I also note that Williams's coworker, Alex Young, initially testified in an affidavit that the accident at issue occurred at approximately 8:00 p.m. In his June 30, 2005, deposition, however, after Billy Barnes had presented evidence that the last of its trucks left Weyerhaeuser's facility at 6:37 p.m., Young recanted his statement that the accident occurred at approximately 8:00 p.m.

In his brief to this Court, Williams argues that he gave his prior recorded statement while under stress and while under the influence of pain medication. He makes no such argument as to Young's recanted affidavit testimony.